UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARRELL BOYD,

                              Petitioner,

-vs-

THOMAS STICHT, Superintendent,[1]

                              Respondent.
_____

DECISION AND ORDER

6:18-CV-6614 CJS

## INTRODUCTION

Petitioner Darrell Boyd ("Boyd" or "Petitioner") brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in New York State Supreme Court, Monroe County, upon a jury verdict, of Murder in the Second Degree, for which he was sentenced to a term of imprisonment of twenty-five-years-to-life.  The Petition (ECF No. 1) asserts that the conviction was unconstitutionally obtained for various reasons discussed further below, including that the trial court improperly admitted evidence that deprived Petitioner of a fair trial.  For the reasons explained below, the petition for a writ of habeas corpus is denied.

## BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.  Briefly, on April 20, 2007, Katharina Lawn ("Lawn") was found murdered in her apartment at 835 Merchants Road in Rochester, New York.  Lawn, who lived alone, had been beaten and strangled to death, and her body and bed had been doused in flammable liquid and set ablaze.[2]  However, the fire only smoldered, and at approximately 7:43 p.m. a neighbor noticed smoke coming from Lawn's apartment, whereupon firefighters arrived and found Lawn's body.  Lawn's apartment door

---

[1] Petitioner was confined at Groveland Correctional Facility when he commenced this action, and named the Groveland Superintendent, S. Cronin, as Respondent.  However, the DOCCS webpage indicates that Petitioner is presently confined at Wyoming Correctional Facility, and the Court therefore amends the caption to indicate that the proper respondent is Thomas Sticht, Superintendent at Wyoming.  The Clerk of the Court is directed to amend the caption accordingly.

[2] The autopsy indicated that Lawn was dead before the fire was started.

had been locked and deadbolted, evidently by the perpetrator, inasmuch as Lawn's keys and purse were missing from the apartment.  The autopsy subsequently found material under Lawn's fingernails that tested positive for male DNA.

Petitioner and his wife had formerly been residents of Lawn's apartment building.[3]  Mrs. Boyd and Lawn had been friends, and Lawn had given a copy of her apartment key to Mrs. Boyd, who still had it at the time of the murder.[4]  Approximately sixteen months prior to Lawn's murder, on or about October 25, 2005, Petitioner and Mrs. Boyd had a violent argument in their apartment. Lawn called 911 about the fight after her attempts to calm the situation failed.  Petitioner, who had been on parole at the time, was subsequently returned to prison on a parole violation (domestic violence) and served fifteen months.  Petitioner knew that Lawn had called the police, and told Mrs. Boyd that he blamed Lawn for his return to prison.

By the time Petitioner had completed his sentence for the parole violation, in or about January 2007, Mrs. Boyd had moved to a new apartment, located at 504 Brooks Avenue in Rochester.  Upon Petitioner's release from prison, his parole officer imposed a restriction prohibiting him from contacting Mrs. Boyd or being at her residence, but Petitioner disregarded that condition and frequently stayed at Mrs. Boyd's apartment.  At that apartment, Mrs. Boyd kept her retained key to Lawn's apartment in a desk drawer.  Mrs. Boyd also kept a key to an automobile, belonging to a female friend who lived around the corner from the Brooks Avenue apartment, that she sometimes borrowed.[5]

On one occasion in early 2007, Petitioner's parole officer went to Mrs. Boyd's apartment attempting to locate Petitioner, whom she suspected was at the apartment in violation of his parole conditions.  However, as will be shown later to be relevant to this action, Petitioner avoided the

---

[3] *See*, Trial Tr. at p. 340, 342, 347 (The Boyds lived in Apartment 7, while Lawn lived a few feet away in Apartment 9).

[4] Trial Tr. at p. 343.

[5] Trial Tr. at pp. 353–355, 359.  At that time neither Mr. Boyd nor Mrs. Boyd owned a car.  However, the record suggests that they could take the neighbor-friends car whenever they wanted, with or without her knowledge or permission, such as when she was intoxicated or incapacitated by psychiatric medications

parole officer by climbing out of the basement-level apartment through a window which was partially obscured by bushes.[6]

Shortly before Lawn's death, Petitioner visited Lawn's apartment building at least twice, even though, as Mrs. Boyd later testified, Petitioner and Lawn were not on friendly terms.[7]  These visits by Petitioner to Lawn's apartment (the first in mid-March, the second two days before Lawn's death) were later discovered by police, since after both incidents, Lawn told her granddaughter that Petitioner had visited her and that she was fearful he would return, though she did not say why she feared him.

Ten days after Lawn's murder, on April 30, 2007, detectives from the Rochester Police Department ("RPD") investigating the crime interviewed Petitioner and Mrs. Boyd at 504 Brooks Avenue.  When asked about his relationship with Lawn, Petitioner falsely stated that he had last seen Lawn about a month before her death, when he had gone to her residence while his wife was at a hair salon nearby. When asked about his whereabouts on the afternoon and evening of the murder, Petitioner indicated that he had been at 504 Brooks Avenue watching a baseball game, and that his wife had also been home.   Petitioner stated that he had left the apartment for only about fifteen minutes to go to a nearby store to buy snacks.  Mrs. Boyd also indicated that Petitioner had been home with her and urged the officers to check the apartment building's surveillance camera recordings.  Investigators checked the surveillance-camera recordings of the day of the murder and observed footage of Petitioner exiting the apartment building at around 6:30 p.m. and returning at about 6:45 p.m., which seemed to corroborate what Petitioner had told them.[8]

---

[6] Mrs. Boyd testified that she did not actually see Petitioner go out the window, but that he could not have gone out the door, which was locked, and that the window was open and the screen had been removed. A parole officer looked out the same window and saw a man, presumably Petitioner, walking away from the building in his pajamas. Trial Tr. at p. 562.

[7] Mrs. Boyd told police that Lawn did not like Petitioner and had urged her to leave him, because he was abusive.

[8] The exact time of the murder is uncertain since there was evidence that the intentionally-set fire in Lawn's apartment could have smoldered for hours before it was discovered.

The investigation into Lawn's death subsequently stalled for approximately six years, during part of which Petitioner was again incarcerated for parole violations.  Then, in 2012, investigators found a connection between Petitioner and the DNA evidence that had been found under Lawn's fingernails:

> The investigation went cold until 2012, when a Combined DNA Index System (CODIS) database "hit" linked defendant's DNA profile to DNA material that had been collected from under the victim's fingernails on her right hand during her autopsy. Defendant was incarcerated on an unrelated matter at that time, and the investigators obtained a sample of his DNA for comparison. Further analysis by a forensic biologist at the Monroe County Crime Laboratory confirmed not only that defendant could not be excluded as a contributor to the DNA that was under the victim's fingernails, but also that "the probability of randomly selecting an unrelated individual who could be a contributor to the mixture obtained under the fingernail clippings of the right hand of [the victim] was less than 1 in 59.4 million."

*People v. Boyd*, 159 A.D.3d 1358, 1359, 73 N.Y.S.3d 301, 304 (2018).

On May 7, 2012, detectives interviewed Mrs. Boyd in connection with their investigations into Lawn's death, and into two other murders that had been committed in 2002.  Specifically, on August 2, 2002, Clara Sconiers and Thomas Reed were beaten to death in their apartment at 262 First Street in the City of Rochester, New York, and their apartment was set ablaze by the perpetrator.  At that time, Petitioner and Mrs. Boyd were also tenants at 262 First Street, though they moved away to Merchants Road shortly after the murders.  Charles Pierre ("Pierre"), who had argued with Sconiers prior to the murders, was convicted of the crimes.  Several years later, after police responded to another domestic dispute between the Boyds, Mrs. Boyd told an officer that Petitioner had committed the First Street murders and that an innocent man (Pierre) had been wrongly convicted.   However, Mrs. Boyd had refused to provide any additional details.  Subsequently, in 2012, while investigating Petitioner's involvement in Lawn's murder, officers discovered the police report from the earlier domestic incident, containing the reference to the First Street murders, and re-interviewed Mrs. Boyd, who was by then willing to cooperate. *See,*

generally, *Pierre v. City of Rochester*, No. 16-CV-6428 CJS, 2018 WL 10072453, at *1 (W.D.N.Y. Sept. 7, 2018*); see also, People v. Pierre*, 129 A.D.3d 1490, 1491, 11 N.Y.S.3d 389, 390 (2015).

Mrs. Boyd told the detectives that immediately after the First Street murders, Petitioner told her that he had killed Sconiers and Reed, and gave her property purportedly stolen from Sconiers' and Reed's apartment.  According to Mrs. Boyd, Petitioner then threatened that he would kill her if she ever went to the police.[9]  Investigators had several interviews with Mrs. Boyd concerning these matters, one of which, on May 7, 2012, they recorded.[10]

At around this same time, police investigators were contacted by Dolph Sturgis ("Sturgis"), a prison inmate who had been incarcerated with Petitioner, who told them that Petitioner had admitted killing Sconiers, Reed and Lawn.  With regard to Lawn's murder, Petitioner had reportedly told Sturgis, among other things, that he had avoided being seen by the surveillance cameras at his wife's apartment building by climbing out the apartment window.  Investigators returned to the Brooks Avenue apartment building and confirmed that there were areas near the Boyd's old apartment's windows that were out of view of the building's surveillance cameras.

Also, in 2012, Petitioner was overheard, on a recorded telephone call from jail to his girlfriend, blaming Mrs. Boyd for his most-recent parole violation and stating that he was considering taking revenge against her, upon his release from jail, by throwing a Molotov cocktail into her place of employment, provided he could find a way to evade surveillance cameras.

In April 2013, and May 2013, respectively, Investigators interviewed Petitioner, who was as yet unaware that police had found DNA under Lawn's fingernails.  During the first interview, investigators used a ruse to convince Petitioner to provide another DNA sample.  During both interviews, Petitioner again falsely stated that the last time he had seen Lawn was about a month before her death, when he and his wife had visited Lawn together.  Petitioner specifically denied

---

[9] Petitioner acknowledge to police that he had told Mrs Boyd he had committed the murders.  However, he claimed he had only told her that to "instill fear in her." ECF No. 16 at p. 13.

[10] State Court R., SR 147–149.

having had any romantic relationship with Lawn, whom he described as an eccentric loner. At the conclusion of the second interview Petitioner was charged with Lawn's murder.

Petitioner's case was assigned to the Honorable Alex Renzi, Acting Supreme Court Justice. During pretrial discovery, the defense was provided redacted police reports relating to the interview of Mrs. Boyd on May 7, 2012.[11] The prosecution also disclosed that the May 7, 2012, interview with Mrs. Boyd had been recorded, and indicated that the recording was available for defense counsel to view.[12] Defense counsel subsequently moved to compel production of the unredacted police reports but evidently never sought to view the recording of Mrs. Boyd's interview. Judge Renzi denied the request to compel production of the unredacted police reports after reviewing them in camera and concluding that they did not relate to Petitioner's case and would not be used by the prosecution.[13]

The prosecution's theory at trial was that Petitioner had murdered Lawn for revenge, since she had called the police during the domestic incident in 2005, which had resulted in Petitioner returning to prison for fifteen months. The prosecution's case included testimony from Mrs. Boyd, who was by then divorced from Petitioner, who testified that she could not be sure Petitioner had been at her apartment the entire day of the murder, contrary to what she had told investigators in 2007. At trial Mrs. Boyd stated, rather, that she had been ill with swine flu and had slept much of the day of Lawn's murder. The prosecution also introduced testimony from Sturgis, who indicated that he had known Petitioner in prison for eight months and had assisted Petitioner in preparing legal papers. Sturgis, who had spent most of his adult life in prison for murder, testified that Petitioner initially sought his advice about DNA evidence, and later confided to him how he had

---

[11] Petitioner has acknowledged that the subject interviews with Mrs. Boyd pertained to his involvement in all three murders. *See, e.g.*, Pet'r *Pro Se* Supplemental Br. submitted on direct appeal, State Court R., SR 438–439 (Indicating that the interview with Mrs. Boyd on May 7, 2012, related to her allegations about Petitioner's involvement in the murders of Sconiers, Reed and Lawn).

[12] State Court R., SR 148, 154.

[13] *See*, *Huntley* Hr'g Tr. at pp. 5–6 ("Court: I have both copies in front of me, and I have reviewed both. At this point, I'm not going to direct the People to turn over the redacted portions. They are not related to this case, and the People have made an affirmative statement that they are not going to use any information contained in the redacted parts on their case.").

killed Lawn.  Petitioner reportedly told Sturgis, in particular, that there were "blind spots" in the coverage of the video cameras at the Brooks Avenue apartment, and that on the day of the murder he had intentionally walked by the video cameras at the Brooks Avenue apartment to give himself an alibi by making it appear that he had entered and remained in his wife's apartment, after which he had climbed out the window, taken a car belonging to his wife's friend (the key to which, as noted earlier, was in Mrs. Boyd's apartment), driven to Merchants Road, beaten and strangled Lawn, taken some of Lawn's property, and and set the apartment on fire.[14]  The prosecution also introduced, over the defense's objection, and with limiting instructions from the trial court, testimony from Lawn's granddaughter, who testified to what Lawn had told her about Petitioner visiting Lawn's apartment and about Lawn being afraid that he would return, as well as the redacted portion of the recorded jail call in which Petitioner had discussed firebombing Mrs. Boyd's workplace and evading surveillance cameras.   Finally, the prosecution argued that Petitioner's DNA linked him to the crime and further disproved his statements to police that he had last seen Lawn a month before her death.

Petitioner testified in his own defense and claimed that he never knew that Lawn had called the police in 2005, resulting in his fifteen-month incarceration for parole violation.  Petitioner further claimed that he had never attempted to avoid his parole officer by climbing out the window at the Brooks Avenue apartment.  Petitioner also offered an explanation for why his DNA might have been under Lawn's fingernails.  Petitioner indicated, in that regard, that he had previously been untruthful in telling police that he had last seen Lawn a month before her death and that, instead, he had seen Lawn more often than that, because they had been engaged in a long-term sexual relationship.  Petitioner stated that he had stopped by Lawn's apartment in March 2007 by chance, and that she had invited him to come back to see her, and that they subsequently had

---

[14] According to Sturgis, Petitioner also stated that he and Lawn had a sexual relationship and had sold drugs together, and that he had sex with Lawn immediately before killing her, during which she scratched his back, which explained why Petitioner's DNA was under Lawn's fingernails.  However, the autopsy showed no signs of sexual assault and Lawn's body had been fully-clothed in several layers of clothing.

sex on approximately four occasions between March and April of 2007, the last of which was two days prior to Lawn's murder.[15]  Petitioner admitted that his testimony at trial was different than what he had previously told police investigating Lawn's death, and stated there were two reasons why he had not previously told the truth about his relationship with Lawn:  First, because he did not want his wife to know about the alleged affair; and, second, because he felt he had a solid alibi for the murder and did not want the police to view him as a suspect.

The jury evidently disbelieved Petitioner's testimony and, on April 3, 2014, convicted him of Murder in the Second Degree (intentional murder), Penal Law § 125.25[1].  On May 14, 2014, Judge Renzi sentenced Petitioner to 25-years-to-life.[16]

Shortly thereafter, on July 17, 2014, Monroe County Court vacated Charles Pierre's conviction for the murders of Sconiers and Reed, based largely on the statements of Mrs. Boyd and Sturgis concerning Petitioner's admission to those murders.  The Monroe County District Attorney elected to re-try Pierre, contending that the statements by Mrs. Boyd and Sturgis concerning Petitioner's admissions to them were not credible.  However, at the re-trial, the jury evidently found otherwise (as did the jury at Petitioner's trial), and acquitted Pierre.[17] Petitioner had been called as a witness at Pierre's re-trial but invoked his Fifth Amendment right not to testify.

Petitioner subsequently filed a collateral attack on his conviction pursuant to New York Criminal Procedure law § 440.10, arguing, in pertinent part, the following:  1) prosecutorial misconduct, in that the prosecutor had relied on false evidence (the testimony of Sturgis and Mrs.

---

[15] Trial Tr. at pp. 923–924.

[16] At sentencing, Judge Renzi stated, in pertinent part: "I know you claimed your innocence and that was evident by the tale you told to the jury, and that's what it was, a tale, and it's obvious the jury didn't believe anything you had to say.  I'm not saying the proof was overwhelming, but it was clearly beyond a reasonable doubt.  Nobody saw what you did.  The police were able to piece this all together and your DNA sealed this case.  Your explanation of how it got there was incredible." Sentence Tr. at p. 13.  In later affirming Petitioner's conviction, the Supreme Court, Appellate Division Fourth Department, disagreed with one aspect of Judge Renzi's statement, finding that there was "overwhelming proof of [Petitioner's] guilt."

[17] Petitioner insists that the testimony by Mrs. Boyd and Sturgis was patently incredible, but ignores the fact that two different juries found the testimony credible.

Boyd), and had argued in Petitioner's case that the evidence was reliable, but had argued the opposite in Pierre's re-trial; 2) violation of *Brady*[18] and *Rosario,*[19] in that the prosecutor had failed, in response to Petitioner's omnibus motion, to turn over the complete recording of the May 7, 2012, interview of Mrs. Boyd, and instead had turned over only a redacted report of the interview; 3) newly discovered evidence warranting a new trial, consisting of "new" evidence that the windows in the Brooks Avenue apartment were too small for Petitioner to have climbed through;[20] and 4) ineffective assistance of trial counsel, based on counsel's failure to investigate and to demand production of the recorded interview of Mrs. Boyd on May 7, 2012.  Judge Renzi denied Petitioner's application, finding that the prosecutor had not knowingly presented false testimony; the prosecutor had disclosed the existence of the recorded interview of Mrs. Boyd to the defense; the evidence relating to the apartment window was not new; and trial counsel had provided effective assistance.[21]    The New York State Supreme Court, Appellate Division Fourth Department, denied leave to appeal.

Petitioner subsequently filed a direct appeal,[22] raising, in pertinent part, the following arguments: 1) the trial court erred in admitting the hearsay statements by Lawn's granddaughter and the redacted recording of the Petitioner's jail phone call; 2) the trial court erred in failing to require the prosecution to disclose un-redacted copies of the police reports concerning the interviews of Mrs. Boyd in May 2012; and 3) the prosecution violated "*Brady* and/or *Rosario*" by failing to turn over the recording of the interview of Mrs. Boyd on May 7, 2012.[23]  The New York State Supreme Court, Appellate Division Fourth Department, denied the appeal, finding, in

---

[18] Referring to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).
[19] Referring to "*People v. Rosario*, which "entitles the defense to examine a witness'[s] prior testimony, whether or not it varies from his testimony on the stand." 9 N.Y.2d 286, 289 (N.Y. 1961)." *Patel v. Smith*, No. 21-CV-992, 2022 WL 1460211, at *4 (E.D.N.Y. May 9, 2022).
[20] Petitioner argued that the evidence concerning the windows was not discovered sooner due to the ineffective assistance of trial counsel.  However, as already discussed, there was evidence at trial from which the jury could reasonably conclude that Petitioner did indeed fit through the window when avoiding his parole officer.
[21] *See*, State Court R. at SR. 166–172.
[22] The appeal consisted of both a counseled brief and a supplemental *pro se* brief.
[23] State Court R., SR 442–451.

pertinent part, that the trial court's alleged cumulative evidentiary errors did not deprive Petitioner of a fair trial, and that the trial court had properly ruled that Petitioner was not entitled to the redacted portions of the police reports, since the redacted information was not relevant to Petitioner's case.  The Appellate Division also found, with regard to the alleged evidentiary errors, that the trial court had properly admitted the testimony of Lawn's granddaughter pursuant to a hearsay exception, and had properly admitted the redacted jail telephone recording since Petitioner had "described a distinctive and unique modus operandi that was sufficiently similar to the manner in which the instant crime was committed."[24]   The Appellate Division declined to consider the *Brady/Rosario* claim on procedural grounds, finding that it was based on matters outside the record (and should therefore be raised in a motion under CPL § 440.10) and/or unpreserved for preview.  The New York Court of Appeals denied leave to appeal.

In the instant action, liberally construing the Petition to raise the strongest arguments that it suggests, Petitioner purports to raise the following grounds for vacating his conviction: 1) the trial court denied him a fair trial by admitting the testimony of Lawn's granddaughter under a hearsay exception; 2) the trial court denied him a fair trial by admitting the jail phone call recording as evidence of motive and modus operandi; 3) both the jail phone call recording and his statements to Sturgis should have been suppressed, since the recording was obtained without his consent[25] and the statements to Sturgis were obtained in violation of his right to counsel; 4) the trial court "denied him a defense" by denying his request for unredacted copies of police reports; 5) the prosecution violated *Brady* and *Rosario* by failing to turn over the recording of Mrs. Boyd's interview on May 7, 2012; and 6) actual innocence.

Respondent opposes the application, asserting the following points: 1) the claims involving the state trial court's evidentiary rulings are not cognizable on federal habeas review and,

---

[24] State Court R., SR 486–487.

[25] Petitioner admits that there were warnings advising him that his calls would be recorded, but contends that "his consent was limited to monitoring and recording of his telephone calls.  This limited consent did not extend to the dissemination of the recordings of the calls to the prosecutor handling his case." ECF No. 4 at p. 28.

alternatively, are procedurally defaulted, since Petitioner never raised them as federal constitutional claims in the state proceedings, and also meritless, since the trial court's evidentiary rulings did not deprive Petitioner of a fair trial;  2) the claims alleging improper use of the recorded jail telephone call and statements made to Sturgis are procedurally defaulted and meritless; 3) the "denial of a defense" and "*Brady/Rosario*" claims are not cognizable on federal habeas review insofar as they are based on state law (*Rosario*), and otherwise lack merit; and 4) the "freestanding actual innocence" claim is not recognized in the Second Circuit and lacks merit in any event.

Petitioner filed a Reply (ECF No. 13) and an "Amended Memorandum" (ECF No. 16), both essentially reiterating the arguments in his memorandum of law filed in support of the Petition.[26]

The Court has considered the arguments of the parties and the entire record.

## DISCUSSION

### Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

### Evidentiary Hearing Not Required

Pursuant to Rule 8 of Rules Governing Habeas Corpus cases under Section 2254 in the United States District Courts and upon review of the answer, transcript and record, the Court determines that an evidentiary hearing is not required.

---

[26] The reply brief discusses certain matters not included in the Petition or its supporting memo of law, such as an alleged defect in the indictment. *See, e.g.*, ECF No. 13 at pp. 25–26.  To the extent the reply attempts to raise claims not set forth in the Petition, as listed above, the Court declines to consider them. *See, Silvestre v. Capra*, No. 15CIV9425KPFDCF, 2018 WL 3611988, at *31 (S.D.N.Y. July 27, 2018) ("[A] habeas petitioner may not raise a federal claim for the first time on reply. *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts (stating that a habeas petition "must ... specify all grounds for relief available to the petitioner"); *see also Ennis v. Artus*, No. 09cv10157, 2011 WL 3585954, at *19 (S.D.N.Y. Aug. 12, 2011) (collecting cases holding that, under this Rule, only claims raised in a Section 2254 petition itself are appropriately considered in a habeas proceeding, and that claims raised solely in the petitioner's reply should not be reviewed), report and recommendation adopted, 2012 WL 3957046 (Sept. 10, 2012).").

<u>Section 2254 Principles</u>

Petitioner brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, and the general

legal principles applicable to such a claim are well settled.

> As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and interpreted by the Supreme Court, 28 U.S.C. § 2254—the statutory provision authorizing federal courts to provide habeas corpus relief to prisoners in state custody—is "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011). A number of requirements and doctrines . . . ensure the centrality of the state courts in this arena. First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance. *See id*. (citing 28 U.S.C. § 2254(b)). Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions. *See generally Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If the state court denies a federal claim on the merits, then the provisions of § 2254(d) come into play and prohibit federal habeas relief unless the state court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1)-(2). Finally, when conducting its review under § 2254(d), the federal court is generally confined to the record before the state court that adjudicated the claim. *See Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1398–99, 179 L.Ed.2d 557 (2011).

*Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014).  As just mentioned, regarding claims that

were decided on the merits by state courts,

> a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

> A state court decision is contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's result.

A state court decision involves an unreasonable application of clearly established Federal law when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case.   To meet that standard, the state court's decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.   It is well established in this circuit that the objectively unreasonable standard of § 2254(d)(1) means that a petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at *7–8 (S.D.N.Y. Jan. 11, 2018)

(Koeltl, J.) (citations and internal quotation marks omitted).

When applying these standards,

[t]he state court's findings of fact are presumed to be correct unless the petitioner can rebut this presumption by clear and convincing evidence[,] [28 U.S.C.] § 2254(e)(1)[, and] [t]he petitioner bears the ultimate burden of proving by a preponderance of the evidence that his [federal] constitutional rights have been violated. *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir.1997).

*Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012), as amended (Aug. 9, 2012).

Conversely, "[a] claim that a state conviction was obtained in violation of state law is not cognizable in the federal court." *Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) and *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998)); *see also, Guerrero v. LaManna*, 325 F. Supp. 3d 476, 483 (S.D.N.Y. 2018) ("The role of federal courts reviewing habeas petitions is not to re-examine the determinations of state courts on state law issues, but only to examine federal constitutional or statutory claims. 28 U.S.C. § 2254(a); *see Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Federal courts deciding habeas petitions do not serve as appellate courts to review state court decisions of state law claims. Their purpose instead is to review whether the circumstances surrounding the petitioner's detention 'violate fundamental liberties of the person, safeguarded against state action by the Federal Constitution.' *Townsend v. Sain*, 372 U.S. 293, 311–312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Habeas petitions may not simply repackage state

law claims, which have previously been found to be meritless, in order to obtain review. *DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004).").

<u>The State Court's Evidentiary Rulings</u>

Petitioner alleges that the state court erred in admitting the testimony of Lawn's granddaughter under the "state of mind exception to the hearsay rule," since Lawn's state of mind prior to her murder, that is, her fear of Petitioner, was not relevant to Petitioner's guilt or innocence. Petitioner alleges that insofar New York State law allowed such evidence as an exception to the hearsay rule, it violated his federal constitutional right to a fair trial. Similarly, Petitioner maintains that the state court violated his federal constitutional right to a fair trial by admitting the redacted recording of the jail telephone call, since the probative value of the evidence, if any, was significantly outweighed by its prejudicial effect. Petitioner contends, for example, that his recorded statements were not really relevant to motive or modus operandi in this case, since his statements of revenge were directed at Mrs. Boyd, not Lawn; since throwing a Molotov cocktail at a living person is not the same as starting a fire to cover up a murder; and since the fire in Lawn's apartment turned out to be a "smoky, smoldering fire," as opposed to an "explosive" fire that would result from a Molotov cocktail.[27]

Respondent answers that alleged errors in state-court evidentiary rulings are not cognizable in a federal habeas proceeding, and, alternatively, that to the extent they are cognizable, here they are either procedurally barred, since Petitioner did not raise them as federal constitutional claims before the state courts, or lacking in merit.

The Court agrees with Respondent that Petitioner never raised these evidentiary arguments as federal constitutional claims before the state courts.

> Under § 2254's exhaustion requirement, 28 U.S.C. § 2254(b), (c), each argument advanced in a federal habeas petition must first have been exhausted through state remedies—that is, presented to the state's highest court, *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005). The petitioner must have "fairly apprised"

---

[27] ECF No. 4 at p. 26.

the state court of the factual and legal premises of the federal constitutional claim. *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir.1991).

*Harris v. Fischer*, 438 F. App'x 11, 13 (2d Cir. 2011). In his reply brief, Petitioner argues that he raised federal constitutional claims before the state courts, but does not show that he raised these particular claims as such. Moreover, the Court concludes from its review of the state court record that he never raised them as such. Accordingly, the claims are unexhausted.

Respondent further contends, and Petitioner has not disputed, that the unexhausted claims are procedurally defaulted, since Petitioner is now procedurally barred by New York law from raising them before the New York State courts. Consequently, the claims must be denied unless some exception applies:

> If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we "must deem the claim [ ] procedurally defaulted." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (noting the "apparent salve" of deeming a claim not presented in state court exhausted is "cold comfort"). Our dismissal of an application for habeas relief on the ground of procedural default amounts to "a disposition of the habeas claim on the merits." *Id*. An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating "cause for the default and prejudice" or by showing that he is "actually innocent" of the crime for which he was convicted. *Id*.

*Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).

Here, Petitioner has not attempted to show cause or prejudice for the procedural default,[28] though he does purport to assert a "free-standing actual innocence claim." As evidence of his alleged actual innocence, Petitioner notes that when investigators first interviewed Mrs. Boyd on April 30, 2007, ten days after Lawn's murder, she told them that Petitioner had been home all

---

[28] Petitioner has alleged various instances of ineffective assistance by trial counsel, but has not asserted or shown that the default in failing to present the subject evidentiary arguments as federal constitutional claims to the state courts, in his Section 440.10 motion or on direct appeal, was due to ineffective assistance of counsel.

day, and that the video surveillance recording viewed by investigators that day appeared to support that statement.[29]

Petitioner further argues that the prosecution did not actually prove that he avoided the surveillance cameras by climbing out the apartment window, but, rather, relied on mere speculation and the unreliable testimony of Sturgis and Mrs. Boyd, both of whom had a motive to lie.

Essentially, Petitioner argues that his apparent exoneration by the video surveillance cameras must be accepted as conclusive proof of his innocence:

> The continued myopic reliance on the testimonial evidence of Sturgis, against a surveillance video, which is a pervasive and insistent part of society, is not only a miscarriage of justice, but is a manifest injustice. There is no overwhelming evidence that might justify a court in discounting Mr. Boyd's alibi, as the trustworthiness of surveillance cameras is more compelling than an inference of guilt. The day a surveillance system's cameras cannot allow an innocent person the gateway of [actual innocence] is the day the justice system needs to be disposed [of].

ECF No. 4 at p. 47.  The Court, though, disagrees.

As a preliminary matter, Petitioner's "freestanding actual innocence claim" must be denied, since this Circuit does not recognize such a claim, though, as already indicated, a claim of actual innocence may be used as an exception to a procedural bar:

> Federal law as of yet does not recognize freestanding actual innocence claims. As a result, "[t]he petitioner raising such a claim does not seek to have his conviction vacated on grounds of innocence; rather, he seeks to create sufficient doubt about his guilt that the habeas court will permit him to pursue his accompanying constitutional claims notwithstanding an otherwise applicable procedural bar." *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013).

---

[29] Petitioner contends that and that the failure by police to seize the recording as evidence entitles him to relief here, even though there is no dispute as to what the video showed, and that the trial court should have given an adverse inference jury instruction regarding the failure to preserve the surveillance video. ECF No. 4 at p. 40.  These arguments are meritless.

*Bryant v. Thomas*, 725 F. App'x 72, 73 (2d Cir. 2018).  However, the standard for such a showing is demanding:

> The Supreme Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or ... expiration of the statute of limitations." *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). But this standard is demanding: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See id*. at 386-87 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

*United States v. Farley*, 2018 WL 4804691 at *6.

As the preceding quote indicates, an actual innocence argument must be based on newly-discovered evidence.  Here, Petitioner's actual innocence argument here is not based on new evidence.  The closest Petitioner comes in that regard is hearsay evidence from someone who, after the trial, allegedly measured the windows at the Brooks Avenue apartment and opined that they were too small for Petitioner to have fit through.  However, that evidence is not new, nor is it convincing in light of other evidence indicating that Petitioner was able to fit through the window. Petitioner has therefore not made the showing of actual innocence required to excuse his procedural default, and the evidentiary claims are denied as procedurally defaulted.

Alternatively, the Court also agrees with Respondent that the evidentiary claims are non-cognizable and/or lacking in merit.  Errors involving a state court's evidentiary rulings are generally not reviewable in a Section 2254 habeas proceeding, unless they affect the fundamental fairness of the state proceeding:

> Under Supreme Court jurisprudence, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review. *See Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (citing *Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (noting the Court's "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts")). Therefore, unless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable in this context. *See DiGuglielmo v. Smith*, 366 F.3d 130, 137 (2d Cir. 2004) (per curiam)

(citing *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)) (holding that introduction of improper evidence does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."). Such unfairness will only result where: ["][T]he erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, [and] highly significant.["] *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985) (internal quotation marks omitted).

*McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 72–73 (2d Cir. 2011) (footnote omitted).

In this case, to the extent the trial court erred at all under New York State law, in admitting the hearsay statements by Lawn's granddaughter or the recorded jail conversation, which the Court does not find Petitioner to have shown, the errors did not affect the fundamental fairness of Petitioner's trial.  That is, when viewed objectively in light of the entire record before the jury, the evidence was not sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.  Consequently, Petitioner's evidentiary fair trial/due process claims are denied.

<u>Denial of a Defense</u>

Petitioner next alleges that the prosecution and/or trial court "denied him a defense" by failing to provide him with the unredacted report of the interviews with Mrs. Boyd in May 2012.[30] On this point, Petitioner argues that unredacted report was particularly important in his case, since "the only evidence directly tying [him] to the crime was Mrs. Boyd's dubious testimony, corroborated by the similarly suspect testimony of Sturgis."[31]  Of course, that argument ignores a

---

[30] The Petition states: "The court's denial prevented Mr. Boyd from fully preparing his defense.  Whether admissible at trial or not, the information provided in the unredacted reports would have guided the defense in terms of its investigation and preparation for trial." Pet. at p. 9.
[31] ECF No. 4 at p. 31.

great deal of other evidence linking Petitioner circumstantially to the crime, such as the DNA evidence.

Nevertheless, Petitioner insists that the redacted portions of the reports could have been useful in cross-examining Mrs. Boyd.  Petitioner purports to speculate, in that regard, that the redacted portions of the report contain statements by Mrs. Boyd concerning events surrounding Lawn's death that are inconsistent with her statements to investigators in 2007 and/or her testimony at trial.  While Petitioner's argument on this point is not entirely coherent,[32] he seems to insist that the redacted portions of the police reports pertained to the investigation into Lawn's murder, despite Judge Renzi's finding to the contrary.

Respondent, meanwhile, maintains that this "denial of a defense" argument lacks merit, and the Court agrees.  The legal principle upon which Petitioner relies to bring this claim is clear:

> A criminal defendant has "a fundamental due process right to present a defense." *United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013). However, this right "is not absolute, for a defendant must comply with established rules of procedure and evidence designed to assure both fairness and reliability," *id*. (internal quotation marks omitted), "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Williams v. Lord*, 996 F.2d 1481, 1483 (2d Cir.1993) (internal quotation marks omitted). The erroneous exclusion of evidence violates a defendant's federal constitutional right to present a defense only if "the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (brackets and internal quotation marks omitted).

*United States v. Platt*, 608 F. App'x 22, 28–29 (2d Cir. 2015).

Here, Petitioner has not shown that the redacted portions of the police reports would have created a reasonable doubt as to whether he murdered Lawn.  Rather, he merely speculates that the redacted information related to this case and would have been useful to impeach Mrs. Boyd's trial testimony.  However, Judge Renzi found that the redacted information did not relate to this action, and Petitioner has not shown otherwise by clear and convincing evidence.  Petitioner has

---

[32] *See, e.g.*, Pet'r Mem. of Law, ECF No. 4 at p. 32 ("Here, Mr. Boyd sought the redacted portions of the accusatory instrument of the testimony [sic] of Mrs. Boyd, which was also the subject of the charge, and failure to disclose this evidence which had some value as exculpation and impeachment[.]").

offered no reason to doubt that Judge Renzi's finding was correct.[33] In that regard, it is undisputed that the police interviews of Mrs. Boyd in May 2012 concerned both the murder of Lawn and the murders of Sconiers and Reed,[34] with the reasonable inference being that the redacted sections of the reports relate to Sconiers and Reed.  Petitioner has not explained how the redacted statements by Mrs. Boyd concerning the First Street murders would have been useful to his defense in this action.  Consequently, Petitioner's "denial of a defense" claim is denied.

<u>Violation of *Brady* and *Rosario*</u>

Petitioner also contends that the prosecution violated *Brady* and *Rosario* by failing to turn over the recording of the police interview with Mrs. Boyd on May 7, 2012.  Petitioner alleges that the recording might have been helpful to the defense to impeach Mrs. Boyd with prior inconsistent statements.  Petitioner argues, primarily in that regard, that the statements Mrs. Boyd made to investigators on May 7, 2012, were apparently different than what she told investigators on April 30, 2007, ten days after Lawn's murder.[35]

However, Mrs. Boyd said very little to the investigators on April 30, 2007.[36]  In particular, she told the investigators the following:  She and Lawn were friends; she had last seen Lawn about a month earlier; Petitioner had been at home with her all day on April 20, 2007; and she still had a key to Lawn's apartment but did not know where it was.  Mrs. Boyd's trial testimony was inconsistent with those statements in just two respects:  First, she stated that she was not sure whether Petitioner had been home with her the entire day on April 20, 2007, since she had been ill with the swine flu and had slept most of the day; and, second, she stated that she kept

---

[33] *See, e.g., Pierre v. City of Rochester*, No. 16-CV-6428 CJS, 2018 WL 10072453, at *3 (W.D.N.Y. Sept. 7, 2018) ("[O] n May 2, 2012, RPD Investigator Robert Brennan ("Brennan") was investigating Darrell Boyd's involvement in another crime [(Lawn's murder)], when he discovered the report written by Officer Bushart in 2005, in the RPD's files. Brennan interviewed Mrs. Boyd, who admitted that her husband had confessed to her that he had committed the 2002 murders and arson.").
[34] *See, e.g.,* Pet's Supplemental *pro se* Appellate Br., State Court R., SR 438-439 (Acknowledging that the interview of Mrs. Boyd on May 7, 2012, pertained to the murders of Lawn, Sconiers and Reed).
[35] ECF No. 4 at pp. 36–37.
[36] *See,* Police Report, State Court R., SR 147.

Lawn's apartment key in a desk drawer.[37]   Moreover, the most damning aspect of Mrs. Boyd's trial testimony involved something that she never discussed with investigators in 2007, namely, that Petitioner knew that Lawn had called the police about the domestic dispute in 2005, and that he blamed Lawn for his resulting 15-month sentence for parole violation.[38]

Petitioner has not shown that Mrs. Boyd's trial testimony was inconsistent with anything she told investigators on May 7, 2012, as summarized in the redacted police reports.   Rather, he speculates that the recording of the May 7, 2012, interview might contain additional statements that could have been used to impeach Mrs. Boyd at trial.   In sum, Petitioner's assertion that the recorded interview contained exculpatory impeachment material is entirely speculative.

Petitioner raised the same *Brady/Rosario* claim, concerning the recording of May 7, 2012, interview with Mrs. Boyd, in his Section 440.10 motion.   In opposing that claim, the prosecution stated:

> [A] copy of the discovery letter and redacted report of Investigator Brennan reveal that Defendants was actually made aware of the interview of Kathleen Boyd in June, 2013, well in advance of his trial.   Contrary to defendant's claims, the People fulfilled all of their constitutional and statutory duties with respect to Kathleen Boyd's interview.   The entirety of the interview was not disclosed as a large portion pertained to an unrelated case and did not impact Ms. Boyd's credibility as a witness.   Any information remotely relevant to this case or Ms. Boyd's credibility was tim[ely] disclosed.

State Court R., SR 140.

In opposing the instant habeas Petition, Respondent does not specifically discuss the recorded interview, focusing instead on the redacted police reports.[39]   Respondent maintains more generally, however, that with regard to the police interviews of Mrs. Boyd, the prosecution disclosed all that it was required to disclose and that the undisclosed aspects are not *Brady* material since they did not relate to this action and were not exculpatory. Respondent further

---

[37] Trial Tr. at pp. 349, 392.
[38] *See, e.g.*, Trial Tr. at 349 (Mrs. Boyd testified that Lawn was inside the Boyd's apartment when she called 911).
[39] *See*, Resp't Mem. of Law at pp. 8–9, 17–20.

contends that insofar as Petitioner is relying upon New York discovery rules and/or *Rosario*, the claim is not cognizable in this action.

The Court again agrees with Respondent.  Preliminarily, the Court agrees that Petitioner's claim under *Rosario* is a matter of state law that is not cognizable in this action. *See, Patel v. Smith*, No. 21-CV-992, 2022 WL 1460211, at *4 (E.D.N.Y. May 9, 2022) ("[A]lleged '*Rosario* violations are not cognizable in habeas corpus proceedings because they are purely errors of state law." *Ward v. Lee*, 2020 WL 6784195, at *12 (E.D.N.Y. Nov. 18, 2020) (collecting cases). If Petitioner 'had brought a claim under the equivalent federal statute to *Rosario*' – the Jencks Act – 'it would not be cognizable either.' *Id*. (collecting cases).").

> A *Brady* violation, on the other hand, is a violation of federal constitutional law. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. A *Brady* violation requires proof that "[t]he evidence at issue [was] favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence [was] suppressed by the State, either willfully or inadvertently; and [that] prejudice [ ] ensued." *Stickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Moore v. Illinois*, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

*Sanabria v. Martuscello*, No. 15CIV1534CSLMS, 2019 WL 4942118, at *8 (S.D.N.Y. Oct. 8, 2019); *see also, United States v. Alston*, 899 F.3d 135, 147–48 (2d Cir. 2018) ("Brady violations have three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).").

"A defendant cannot satisfy the suppression requirement [of a *Brady* claim] if the defendant, directly or through counsel, 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" *Lamberti v. United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)), *aff'd sub nom. Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999).  Moreover,

> [t]o establish prejudice, a plaintiff must show that the evidence was material. The touchstone of materiality is a reasonable probability of a different result.  As the Supreme Court has explained: The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 124 (2d Cir. 2015) (citations and internal quotation marks omitted).

Applying these principles in the instant case, the prosecution did not "suppress" the recorded interview with Mrs. Boyd, since it disclosed the recording to the defense and offered to make it available for inspection. *See, Velazquez v. Artus*, No. 6:14-CV-06265(MAT), 2015 WL 1097409, at *9 (W.D.N.Y. Mar. 11, 2015) ("The prosecutor cannot be said to have 'suppressed' any potential *Brady* material, since she disclosed the existence of the sweater and glasses, well before trial, and offered to make them available for defense counsel's inspection. Petitioner's *Brady* claim therefore fails as a matter of law.").  Nor has Petitioner shown prejudice by demonstrating that the recording was material.  Consequently, Petitioner has not demonstrated that the state courts' denial of his *Brady* claim was either contrary to, or involved an unreasonable application of, clearly established Federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the State court.

<u>Suppression of the Recorded Jail Call and the Statements Made to Sturgis</u>

Lastly, Petitioner contends that the recording of his jail telephone call and the statements he made to Sturgis should have been suppressed, since they were obtained in violation of his federal constitutional rights.  With regard to the phone call, Petitioner contends that while he may have consented to the call being recorded, he did not consent to the recording being given to prosecutors.  As for the statements made to Sturgis, Petitioner contends that the prosecutor used Sturgis to elicit statements from him in violation of his right to counsel.  Respondent maintains, however, that these arguments are procedurally defaulted and meritless.

The Court agrees that the arguments are unexhausted and procedurally defaulted, since Petitioner never raised them in his state-court collateral attack or direct appeal.   Moreover, Petitioner has not shown that the procedural default should be excused due to cause and prejudice or actual innocence. *See, Carvajal v. Artus*, 633 F.3d at 104 ("An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating cause for the default and prejudice or by showing that he is actually innocent of the crime for which he was convicted.") (citation omitted). This aspect of the Petition is therefore dismissed.

CONCLUSION

The application under 28 U.S.C. § 2254 is denied.   Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right.   The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).   Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.   Finally, the Clerk of the Court is directed to amend the caption as noted above (*See*, footnote 1) and to close this case.

So Ordered.

Dated: Rochester, New York
       July 12, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge